Filed 7/26/16  P. v. Woods CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SHANE LAWRENCE WOODS,<br><br>　　　　Defendant and Appellant. | C080078<br><br>(Super. Ct. No. MCYKCRBF13415) |

　　　　A jury acquitted defendant Shane Lawrence Woods of two counts of sexual penetration of his 16-year-old daughter, K. (Pen. Code, § 289, subd. (h)), but found him guilty of sexual battery (Pen. Code, § 243.4, subd. (e)(1)).

　　　　On appeal, defendant contends: (1) his conviction was not supported by substantial evidence; (2) the trial court improperly excluded evidence of reasons why he grounded K.; (3) the trial court deprived him of his right to face-to-face confrontation with his accuser and his right to a fair trial by ordering the attorneys to ask questions from a position that allowed K. to avoid eye contact with him; (4) a police officer was improperly permitted to offer his opinion on the veracity of K.'s statements, and

1

defendant's trial counsel's failure to object was ineffective assistance of counsel; (5) the trial court erred in instructing the jury regarding its consideration of a prior uncharged sexual offense; and (6) there was no good cause to support the imposition of a 10-year no-contact order at sentencing, and any failure to object by his trial counsel was ineffective assistance. We disagree and affirm the judgment.

## I. BACKGROUND

In March 2013, K. lived with her father and younger sister in a hotel. K. was 16 years old.

At trial, K. testified that on March 29, 2013, she asked defendant to examine a recent injury to her tailbone. K. was on her stomach, wearing a shirt and underwear. Her younger sister was sleeping next to her. K. felt her father caress her buttocks and then move toward her vagina. He did this three times, each time stopping after she told him it did not hurt there. At least one of these times, she yelled. He inserted his fingers into her vagina for about three seconds. He also inserted his finger into her anus. When he removed his hands for good, he told her, "You are wet." K. looked at him with disgust and pulled up her underwear. She was scared, and so she laid on the bed and cried. She did not speak to defendant, but he hugged her and said, "I'm so sorry. You're so—you are so gorgeous. I guess I lost my self-control."

K. also testified that she and defendant used to wrestle. Once, her breast became exposed. After she covered herself, defendant said, "Let's wrestle again." K. said she did not want to, and asked why he did. Defendant explained he wanted to see her breasts again.

Allawna Woods is defendant's sister. She testified that shortly after midnight on March 30, 2013, K. texted Allawna but Allawna did not hear the notification for the text. At around 2:00 a.m., K. texted Allawna again: "[K.] had my name capitalized with an exclamation mark, which I took as, 'Where are you.'" Allawna replied that K. should call Allawna's home phone. K. did. K. was whispering, crying and not breathing well

2

because she was so emotional. Allawna eventually pieced together that K. had been sexually violated by her father and wanted Allawna to come get her.

Allawna came and took K. and her sister back to Allawna's house. K. was crying and having some difficulty explaining to her aunt what happened. They decided to go to the police, and Allawna suggested that K. write down what happened.

In the morning, they walked to the police station. After K. made her report to the police, Child Protective Services asked Allawna to care for K. and her sister. Allawna agreed and had been caring for them ever since. Allawna testified that it was difficult for her to come to court and testify because "in believing K. and supporting her, I feel that the rest of my family has just set me aside, and they haven't been a part of our lives."

Joseph Russell is Allawna and defendant's step-father.[1] He had guardianship over K. and her sister for a period of time in 2011 until the end of 2012, when they went back to live with defendant. Around that time, Joseph asked Allawna to leave him alone. After the incident between K. and defendant, Allawna moved. She withheld her new address from family members, including Joseph, so they could not show up at the house without her knowing. She said, "That was a really difficult time that I didn't know what anybody's intentions were."

Yreka City Police Officer Kash Hasemeyer took a statement from K. on March 30, 2013. K. gave him some papers she had written about the incident. She told the officer that at about 10:00 p.m. the prior evening, she was laying on her back while defendant checked to see if she had been injured. K. said she "was weirded out" when defendant checked her groin area, so she rolled over onto her stomach. Defendant caressed her vaginal area and buttocks. He also inserted his finger into her vagina for approximately five minutes, and her anus once. K. told defendant several times not to touch these areas

---

[1] The spelling of Joseph Russell's and Kristi Russell's names are taken from defendant's witness list.

3

because it did not hurt there. Defendant disregarded her instructions. When it was over, K. lay on the bed for awhile and sobbed to herself. As she cried, her father said he was sorry and that he could not control himself because K. was "so gorgeous."

## II. DISCUSSION

A. *Substantial Evidence*

Defendant argues there was insufficient evidence to support his conviction for sexual battery. Penal Code section 243.4, subdivision (e)(1) punishes "[a]ny person who touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." As set forth above, the evidence that defendant committed this crime was substantial. Defendant disputes this indirectly by asserting substantial evidence did not support finding K. credible. Defendant notes inconsistencies in K.'s trial testimony as compared to her earlier statements or the testimony of others. For instance, K. testified that her father inserted his fingers into her vagina for about three seconds, but told Officer Hasemeyer it was about five minutes. K. testified at the preliminary hearing that her father did not insert his fingers into her anus, but testified at trial that he did.[2] K. also testified she did not text Allawna Woods, but Allawna testified K. did text her before calling. Defendant also attacks K.'s credibility in part by noting that her younger sister did not believe her, and speculating that K.'s yelling during the incident should have awoken her sister. Defendant suggests other details from that evening make K.'s

---

[2] We note, as the trial court did, that these conflicts are consistent with the jury's finding that there was not proof beyond a reasonable doubt of sexual penetration, but there still remained adequate evidence, if believed, to support the sexual battery conviction beyond a reasonable doubt.

4

allegations implausible and that, as discussed below, she had a motive to fabricate them.**3**

These were issues for the jury to resolve, and we see no basis to disturb their findings on appeal.

"In deciding the sufficiency of the evidence, we ask whether ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Defendant has not identified physical impossibilities or inherent improbabilities that could justify rejecting statements that were believed by the jury, but rather the type of issues that were within their exclusive province. We conclude substantial evidence supports the jury's verdict that defendant committed sexual battery against K. With that, our inquiry into defendant's substantial evidence claim must end.

B.      *Exclusion of Evidence of the Reasons Defendant Grounded K.*

        *1.  Trial Court's Ruling*

        Defendant challenges the trial court's exclusion of evidence of the reasons why he grounded K. on two different occasions. On appeal, defendant describes the information as such: "One incident involved her being out with boys and getting intoxicated to the

---

**3** For instance, defendant contends K. texted people who were too far away to come to her assistance, Allawna took longer than she should have to come get K., and K. should not have waited until defendant was asleep to call Allawna.

5

point where she had to be taken to the hospital, the other involved her disappearance from the parking lot of the motel where she, her sister and [defendant] were living, and being found to have been in the company of a boy."

The issue of the admissibility of the circumstances that gave rise to K.'s grounding first arose in the context of the prosecution's motion in limine pursuant to Evidence Code section 782 to prohibit defense counsel from asking K. questions about sexual activity other than with defendant.[4] The parties were discussing information defense counsel's private investigator elicited from Joseph Russell, including that Allawna let K. "shack up at her boyfriend's house for three days in Weed." On appeal, defendant does not challenge the exclusion of this evidence, but this discussion produced the trial court ruling he does contest. Defense counsel argued, "[A]s to who she is associating with, unrelated to sex, who she is associating with as a 15-year-old, that is clearly admissible to show that—well—what—what happened was that she was—she was disappearing on a number of occasions and she was grounded. And right after she was grounded a number of things happened. And one of those things is that she alleged that [defendant] committed this act. We are not bringing in that she had sex with anyone. We don't know that, quote, unquote, 'She had sex with anyone.' But we do know that she wanted her freedom. She wanted to do what she wanted to do. So that is not covered by the Rape Shield Law. And that is largely our defense, that she had a motive for making this and doing this. She was grounded from spring break, stopped from going to a track meet. . . . She ended up in the hospital because she was out with some boys. She was too intoxicated. They had to take her to the hospital. She was grounded. And right after all these things took place, in a very short period of time, she made this accusation against [defendant]."

---

[4] Undesignated statutory references are to the Evidence Code.

The prosecution countered that the reasons K. was grounded were irrelevant and covered by section 782: "The reason why she was grounded, whether or not she was out drinking or partying, or out with other boys and doing God knows what, inferring a sexual purpose here as a . . . she was 16 at the time, is an end run around the Rape Shield Law."

The court granted the prosecution's motion as it pertained to Joseph's potential testimony. "That, of course, applies to any potential testimony that [K.] was involved in, inappropriate sexual activity, or other activity, that would potentially imply that she was involved in inappropriate sexual activity, such as being out late with boys, or staying at some boy's house, so forth." The court ruled "the Defense will be entitled to present evidence that the defendant did ground [K.], such that she felt that her freedom was being significantly interrupted, and that therefore she had a motive to fabricate the circumstances that led to these charges." However, the reasons for K.'s grounding could not be referenced without the court's permission.

Defense counsel subsequently explained the basis for the two groundings that are the subject of his current challenge in more detail. About one month prior to the events that gave rise to defendant's conviction, K. was out late at night with some boys and ended up in the hospital for alcohol poisoning. Then, on March 26, 2013, K. disappeared for a few hours and said she was in the parking lot when she was not. The court continued to hold the reasons for the grounding were irrelevant. It noted that if defendant had grounded K. without a good reason, she would arguably have a stronger motive to get out from under his control. The court reiterated its ruling: Evidence that K. engaged in behavior that her father objected to and grounded her for was admissible, "but the details of it, particularly, to say she was out with boys, so forth, I'm not seeing the relevance of that." "The question is not whether or not he had good reason to ground her. The question is whether she so objected to the grounding that she had a motive to falsely accuse your client of these terrible crimes."

7

The following day, defense counsel asked the court to reconsider its ruling. At this point, he added additional detail about the first grounding: "she was out with some friends, mainly boyfriends, . . . she had the phone, she didn't answer the phone, she became intoxicated, they couldn't find her, they contacted the police," and the police located her based on her cell phone. The court asked defense counsel to articulate the relevance of the evidence regarding what caused defendant to ground K. Defense counsel argued defendant did not want his daughter out late with 20-year-old men and restricting K. from seeing her friends was "an extremely strong motivating factor for her making something up." The court reiterated its prior ruling: "It's relevance. And, again, [defense counsel], you have articulated relevance as to motivation, in terms of the alleged victim having a strong desire to have her freedom so she can see her friends, and so forth. I'm not restricting you from going into that. But what you are asking to go into is she was out all night, she was drinking, and so forth. And I recognize that would be helpful in a prejudicial—unduly prejudicial manner to your case, but it's not relevant in the Court's view. [¶] It certainly is relevant for you to go into the fact that she was put on restriction, that, perhaps, she really wanted to see her friends and was not able to do that because of her father's decisions, and that gave her some motivation to figure out a way to get out of his control, which may be a motivation for her to have falsely accused him of these things. You can certainly go into all of those things. [¶] But if you want to go into the specifics of her behavior, having to do—and—and suggest that she's a promiscuous, untrustworthy—you know, whatever kind of disparaging characterization you want to put on her behavior, I'm not going to allow you to do that."

The issue was raised again with respect to defense counsel's opening statement. In it, defense counsel explained that six weeks prior to the charged offense, K. had been "improperly gone" from the family residence and, as a result, defendant restricted her freedom. He also described the second event that led to her being grounded. K. was gone again, with the family cell phone, and could not be located. She was not answering

8

the phone. "And then, finally, a person answered the phone that was not K. and said that K. was not there. Later K. admitted that she was not where she was supposed to be. She was supposed to be home. [¶] I expect the evidence will show that [defendant] read texts, and that's how it was sort of determined whether or not K. had been truthful concerning her whereabouts." The court held defense counsel had complied with the court's earlier ruling: "The whole theory behind the ruling is that we are not to be implying or getting into any sexual behavior by the complaining witness. . . . [¶] . . . I don't want to unduly restrict the Defense from giving a picture that is accurate, but that nevertheless does not cross that line."

On cross-examination, K. testified defendant grounded her six weeks before she went to the police. He had read some of her text messages on the family phone. She acknowledged it was uncommon for her to delete text messages. On Tuesday, March 26, 2013, she was grounded again in part because of a text message defendant had read. Defendant told her she was grounded for spring break, and she was extremely angry about that. She did not serve out her punishment because spring break began after school Friday, the day of the incident. Additionally, defendant acquiesced and let her attend her track meet.

### 2. *Evidence Code Section 782*

Section 782 sets forth procedures to be followed when evidence of the sexual conduct of the complaining witness is offered to attack her credibility under section 780. It is undisputed that defendant did not comply with these procedures. Nonetheless, we note that under them, the trial court may not admit evidence without ultimately determining it is relevant to the witnesses' credibility under section 780 and not inadmissible under section 352. (§ 782, subd. (a)(4).)

Courts have held that the term "sexual conduct, as that term is used in section[] 782 . . . , encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity. The term should not be narrowly construed." (*People v.*

9

*Franklin* (1994) 25 Cal.App.4th 328, 334.) The parties disagree about whether the evidence that K. had disappeared with boys and was hospitalized for intoxication after one of these disappearances constitutes "sexual conduct" such that section 782 applied. We need not resolve this dispute. "[Section 782] reaffirms the role of [section 352] in authorizing the trial court to exclude relevant evidence which is more prejudicial than probative. [Citation.]" (*People v. Casas* (1986) 181 Cal.App.3d 889, 896.) As set forth below, because the evidence was at least excludable under section 352, whether section 782 also applied is irrelevant.

### 3. Evidence Code Section 352

Defendant maintains the facts underlying K.'s grounding were relevant to establish a motive to fabricate her allegations, and they were not inadmissible under section 352. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) The trial court may not admit irrelevant evidence, but it has broad discretion in determining whether evidence is relevant. (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) It also has discretion to exclude even relevant evidence under section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

We find no such abuse. As the trial court noted, it appears that whether defendant's grounding of K. was reasonable had no tendency in reason to prove K. testified untruthfully. To the contrary, if defendant's actions were unjustified, "that

10

would give her a stronger motive to try to get out from under his control." Whether defendant's punishment was just or unjust, the question for the jury was whether K. would invent allegations of sexual abuse to rid of herself of her father and avoid punishment. The factual basis for these two groundings seems to have little bearing on that question.

Even if we assume this evidence had some probative value, the trial court did not abuse its discretion in finding any probative value was outweighed by potential prejudice under section 352. The record supports the trial court's finding that the evidence was unduly prejudicial because it could suggest K. was a promiscuous girl who therefore should not be believed. Defendant contends the proffered evidence did not imply K. was promiscuous but that she was "testing the limits of freedom with inappropriate behavior." If that is the case, the proffered evidence was cumulative, as defense counsel had already elicited evidence that K. sent text messages that resulted in her being grounded, she was extremely angry about being grounded, the charges against her father relieved her of her remaining punishment, her grades had been poor and at times prevented her from playing sports, and her grandfather had put restrictions on the type of clothing she could wear outside of his house because "he didn't want [her] to seem like trash." Defense counsel also questioned K. and Allawna about whether Joseph had forbidden K. from going to a concert in Portland and whether Allawna had purchased tickets for K. anyway. It was not an abuse of the trial court's discretion to exclude additional testimony on these issues. We find nothing arbitrary, capricious or patently absurd about the court's ruling.

*4. Constitutional Claims*

Defendant also asserts the exclusion of this evidence deprived him of his right to a fair trial, to present a defense and confront witnesses.

Generally, the application of ordinary rules of evidence such as section 352 does not infringe on the right to present a defense. (*People v. Hall* (1986) 41 Cal.3d 826, 834.) "Although completely excluding evidence of an accused's defense theoretically could

11

rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Indeed, neither the right to a fair trial nor the right to present a defense confer on defendant " 'a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using [section 352].' [Citations.]" (*People v. Babbitt, supra,* 45 Cal.3d at p. 684.) For the reasons already discussed, even assuming the proffered evidence had some probative value, it was minimal and its exclusion did not deprive him of a meaningful opportunity to present a defense or his right to a fair trial.

Likewise, notwithstanding the confrontation clause, a trial court may restrict cross-examination of a witness based on section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Id*. at pp. 623-624.) We see nothing in this record to indicate that the jury received a misleading impression of K.'s credibility. Accordingly, we reject defendant's contention that the exclusion of evidence related to the circumstances of K.'s grounding deprived him of his constitutional right to a fair trial, to present a defense or confront witnesses.

C.    *Positioning of Counsel During Questioning of K.*

    *1. Trial Court's Ruling*

Outside the presence of the jury, the prosecutor relayed a request from K. prior to her testimony: "She has asked, to make her more comfortable, that all questions from either attorney be asked on this side of the room, because she is very nervous about having to look at her father, and she has asked that, if at all possible, that when we ask her questions it can be over here so she is not having to look at him the entire time." The court clarified for the record that the prosecutor was motioning to the side of the counsel

12

table that was farthest from where defendant was sitting. Defense counsel objected on the grounds that this arrangement would violate defendant's right of confrontation.

The trial court stated K. would not be allowed to turn her back to the jury, defendant or counsel, but "it's a reasonable request that she be able to answer questions and look at the attorneys who are asking her questions, without having to, essentially, lock eyes with her father. [¶] I think it's understandable that this is a difficult situation for her." The court granted the request: "So I'm going to ask counsel to ask their questions from the lectern. And the lectern will be approximately the position it's in now, which is on the end of the [c]ounsel table that is farthest from where defendant is sitting. The defendant will have the opportunity to see and observe the complaining witness as she testifies, and be able to see her facial expressions and so forth. [¶] I think that is adequate for purposes of the requirement that he be able to confront and [c]ross-examine anyone, his witnesses, or witnesses against him."

During a break in K.'s testimony, the court noted it thought it heard her sobbing in the hallway. Then, the court said to defense counsel: "I've noticed that your client a few times has been talking with the lady in the audience section, and I think that's a little bit distracting, at least."

Following the break, the prosecution put the following on the record: "[W]e had a side bar when the jury first came in, prior to this break, prior to K.'s testimony, and I just indicated I noticed that Ms. [Kristi] Russel[l] who has been in court each day, is related to the defendant as his sister, and K. as her aunt, had moved from the right side of the courtroom to the left side of the courtroom as K. was being called. And I mentioned to the Court at side bar that I thought that was inappropriate, and I asked if she could go back to the other side, and not be in the line of sight for K. when she testified." Defense counsel objected to the request.

The court added that, while Kristi Russell had "been in the portion of the audience section that was directly behind the defendant" for most of the trial, after she heard the

13

court instruct the attorneys on their positioning for the questioning of K., "Ms. Russel[l] positioned herself so she would be very closely in the line of sight of the witness." "There is not a right of the defendant to have particular individuals be in particular places in the courtroom, and the Court, of course, was concerned that there was an effort to intimidate the 18-year-old witness. [¶] I was unable to discern any other reason for Ms. Russel[l] to move over there, so it appeared to be a reasonable request on [the] part . . . of the prosecution to have her move." The court also observed, "I think it's quite obvious that Ms. Russel[l] was here supporting the defendant, and, sadly, there appears to be distinct rifts in the family now as a result of this situation. [¶] I saw absolutely no reason for Ms. Russel[l] to move to the position where she would be in the witness's line of sight, other than, perhaps, to make her—make the witness uncomfortable."

### 2. Confrontation Clause

Defendant contends the trial court deprived him of his right to face-to-face confrontation with his accuser by ordering "the attorneys to ask questions from a position which allowed the witness to avoid eye contact with him." Because a witness is always permitted to avoid eye contact with a defendant, this arrangement did not violate the confrontation clause.

The confrontation clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Coy v. Iowa* (1988) 487 U.S. 1012, 1016 (*Coy*), the United States Supreme Court held that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." In the trial court, the state had successfully moved for a screen to be placed between the witness stand and the defendant, pursuant to an Iowa law that permitted children to testify behind a screen that prevented the child from seeing the defendant. (*Id.* at p. 1014 & fn. 1.) The Supreme Court held that placing a screen between the complaining witnesses and the defendant violated this right to face-to-face confrontation.

14

(*Id*. at p. 1020.)  The court left for another day the question of whether any exceptions to the right exist, observing only that something more than the generalized presumption of trauma underlying the Iowa statute would be required.  (*Id.* at p. 1021.)  Nonetheless, the court helped define the scope of the right to face-to-face confrontation.  It does not require eye contact:  "The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions."  (*Id.* at p. 1019.)  A few years later, the court clarified that the right to face-to-face confrontation is also not absolute, and held that a case-specific finding of necessity can justify the use of a procedure permitting a child witness to testify against a defendant in the absence of face-to-face confrontation.  (*Maryland v. Craig* (1990) 497 U.S. 836, 850, 855 (*Craig*); see also *id*. at p. 849 ["In sum, our precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case' "].)

Because defendant complains the trial court facilitated K.'s avoidance of eye contact with him, this case does not involve the latter issue—an exception to the right of face-to-face confrontation—so much as the former—the scope of the right.  Therefore, defendant's citation to cases involving the later issue—cases without any face-to-face confrontation—are not dispositive.  (See, e.g., *Craig, supra,* 497 U.S. at p. 840 [child witness testified outside defendant's presence by one-way closed circuit television]; *Herbert v. Superior Court* (1981) 117 Cal.App.3d 661, 664-665, 671 [finding defendant's right to confrontation had been abridged where it was physically impossible for defendant and witness to see each other];[5] *People v. Murphy* (2003) 107 Cal.App.4th 1150, 1158

---

[5]  We also note the precedential value of *Herbert v. Superior Court* has been questioned. (See *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1078; *People v. Sharp* (1994) 29

[adult victim could not testify behind one-way glass without necessary factual findings].) Situations that do not deny a face-to-face confrontation do not implicate the type of showing required in *Craig*. (*People v. Lord* (1994) 30 Cal.App.4th 1718, 1722.)

Thus, we review the relevant authorities analyzing a confrontation cause challenge where the witness testified in the defendant's presence but at an angle that facilitated the witness's already-permissible avoidance of defendant's gaze.[6] In *Sharp*, "the prosecutor stood or sat next to the witness stand so [the witness] could look away from the defense table while she was testifying." (*Sharp*, *supra,* 29 Cal.App.4th at p. 1780.) The appellant could see the side and back of the witness's head while she testified. (*Id*. at p. 1781.) "[E]ven if he could not clearly see all of her facial expressions," he could see her general demeanor and reactions to questioning. (*Ibid*.) The appellate court found the situation "not materially different from one in which a witness might stare at the floor, or turn her head away from the defendant while testifying" (*id*. at p. 1782) and it "resulted in only the most minimal interference with appellant's right to confront his accuser" (*id*. at p. 1783).

The *Sharp* court rejected the appellant's contention that his confrontation rights were violated: "Surely, appellant cannot be claiming a constitutional right to stare down or otherwise subtly intimidate a young child who would dare to testify against him. Nor can he claim a right to a particular seating arrangement in the courtroom." (*Sharp, supra,* 29 Cal.App.4th at p. 1782.) The trial court did not make explicit findings to support the seating arrangement, but the *Sharp* appellate court noted it was apparent from the record

Cal.App.4th 1772, 1782 (*Sharp*), disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)

[6] In so doing, we reject defendant's assertion that because K. had turned 18 by the time she testified against her father, these authorities have no application to her. (See *People v. Williams* (2002) 102 Cal.App.4th 995, 1007 [permitting adult to testify outside defendant's presence did not violate confrontation clause; "Although *Maryland v. Craig* was a child witness case, we believe the principles it discusses apply here"].)

of the victim's testimony prior to the institution of the arrangement that she "was experiencing considerable distress and suffering inexplicable memory lapses about sex acts she had theretofore consistently reported." (*Id.* at p. 1783.) "She was, in short, unable to participate effectively in the proceedings when seated in the conventional position in the witness box, facing appellant." (*Ibid.*)

Our Supreme Court relied on *Sharp* in reaching a similar conclusion in *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*). *Gonzales* involved the murder of a four-year-old girl by her uncle, the defendant, with whom she was living. (*Id.* at p. 1242.) The defendant's wife, Veronica, was tried separately. (*Id.* at p. 1242, fn. 3.) Prior to the preliminary hearing, the prosecutor represented that the defendant's sons, Ivan, Jr., and Michael, had expressed great fear of the defendant and Veronica, and asked the court to permit the sons to sit facing away from their parents during the hearing. (*Id.* at p. 1265.) The trial court granted the motion and allowed the brothers to sit at an angle: "The podium for counsel . . . was placed so that the lawyers had eye contact with the witnesses during questioning, and the witnesses were free to look around the courtroom and make eye contact with defendants, if they desired." (*Ibid.*)

The People were allowed to admit the videotaped preliminary hearing testimony of Ivan, Jr., after the trial court found that the trauma he would suffer from testifying rendered him unavailable. (*Gonzales, supra,* 54 Cal.4th at pp. 1247, 1261.) The defendant in *Gonzalez* made essentially the same arguments that defendant makes here—that the trial court erred by failing to make a case-specific factual finding of necessity as required under *Craig*, and the prosecution made no factual showing to support its claim that the brothers feared their parents. (*Id.* at p. 1266.) In rejecting this argument, our Supreme Court cited and quoted from *Sharp*. (*Id.* at p. 1267.) It also observed that "while the preliminary hearing court made no factual findings on the need to shield Ivan, Jr., from defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial." (*Id.* at p. 1268.) The court held the

17

seating arrangement was fully justified by the record, as in *Sharp*, and the defendant's confrontation rights were not violated by the introduction of the video tape at trial. (*Ibid*.) Further, the court noted that "[o]ther state courts have approved the use of similar seating arrangements, without the findings required by *Craig*." (*Id*. at p. 1267, fn. 17 [collecting cases].) "The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' [Citation.]" (*Id*. at p. 1268.)

We reject defendant's argument that the trial court's order was constitutionally infirm because "the court did not conduct any sort of hearing during which the prosecutor could establish any particular problems [K.] would have testifying while [defendant] looked at her, nor did the court make the required specific findings that such was the case." These arguments were effectively rejected in *Sharp* and *Gonzales*. Since there is no right to have K. make eye contact with defendant, it was not necessary for the trial court to make specific findings. (See *Gonzales, supra,* 54 Cal.4th at p. 1267, citing *Ellis v. United States* (1st Cir. 2002) 313 F.3d 636, 650 [" 'the less the intrusion on Sixth Amendment rights, the less detail is required in a trial court's findings' "].)

Defendant contends the witness's initial difficulty testifying in *Sharp* and the findings that the witness would be traumatized if he were forced to testify in *Gonzales* made each of those cases distinguishable from his. They do not. This argument ignores a fundamental flaw in his claim—that the trial court's order only facilitated what the witness was already allowed to do without violating defendant's right to confrontation— turn her head away from defendant. Regardless, in making this argument, defendant ignores the evidence in the record that supported the trial court's order and demonstrated that testifying as to sexual acts committed by her father was traumatic for K. and worsened by the battle lines that had emerged within her family. Prior to testifying, K. relayed through the prosecution that she was very nervous about having to look at her father. And even with the repositioning of the attorneys, K. said testifying in front of her

18

father was very difficult.  Moreover, she was unable to recall all of the details of the crime "[b]ecause [she] wanted them gone.  I blocked them out.  I wanted to live my life trying not to remember what happened to me."  She wanted to forget because she "didn't want the pain."  Allawna said testifying was difficult for her as well because of the family's reaction.  Even the trial court observed that K.'s allegations created a rift in the family and was concerned there was an effort to intimidate her.  The prosecution alluded to a related discussion off the record before the request regarding the position of the attorneys.  On this record, we conclude, as did the court in *Gonzales*, that the trial court's order "satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' " (*Gonzales, supra,* 54 Cal.4th at p. 1268.)  Accordingly, there was no violation of defendant's right to face-to-face confrontation.

> ## 2.  *Right to a Fair Trial*

We also reject defendant's claim that the court's order was so inherently prejudicial that it deprived him of his right to a fair trial under *Holbrook v. Flynn* (1986) 475 U.S. 560 and *Estelle v. Williams* (1976) 425 U.S. 501.  (See *Carey v. Musladin* (2006) 549 U.S. 70, 72 [citing these authorities and explaining, "This Court has recognized that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial"].)  "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." (*Estelle v. Williams, supra,* 425 U.S. at p. 504.)  Thus, we view these authorities in context:  "Some courtroom practices are so inimical to the presumption of innocence that they violate defendants' due process rights.  Compelling a defendant to appear at trial in prison garb is impermissible because the constant reminder of the defendant's incarcerated status may affect jurors' perception of him or her as a wrongdoer.  [Citations.]  Unnecessary shackling or gagging of a defendant during trial is improper for the same reason.  [Citations.]  The deployment of excessive numbers of

19

security personnel in a courtroom also can undermine the presumption of innocence. [Citations.]" (*U.S. v. Olvera* (9th Cir. 1994) 30 F.3d 1195, 1196, citing *Estelle v. Williams, supra,* at pp. 504-505 and *Holbrook v. Flynn, supra,* at p. 569.)

Conversely, a witness is always permitted to avoid eye contact. As such, we conclude allowing the attorneys to ask questions from a position which allowed the witness to avoid eye contact with the defendant did not violate his right to a fair trial.

D.      *Testimony of Officer Hasemeyer*

At the end of the prosecution's direct examination of Officer Hasemeyer, he testified regarding the papers he received from K. He explained she handed the papers to him when they entered the conference room, he reviewed them, and then he made a photocopy and put them into evidence. Next, the following exchange occurred between the prosecutor and Officer Hasemeyer:

"Q. Okay. Without telling us what was written in the statement, was it consistent with what she told you in person.

"A. Yes.

"Q. Did you ask K. whether or not what she had written down in that statement was truthful?

"A. Yes.

"Q. And how did she respond?

"A. She advised me that it was what had happened."

Defendant contends for the first time on appeal that the admission of this testimony was improper, and his trial counsel's failure to object was ineffective assistance of counsel. Defendant relies on a line of cases holding that a lay witness's opinion about the truthfulness of another witness's statements is inadmissible. (*People v Melton* (1988) 44 Cal.3d 713, 744; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 239; *People v. Smith* (1989) 214 Cal.App.3d 904, 915; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40.) These authorities are inapposite because Officer Hasemeyer

20

never offered an opinion as to whether K.'s written statement was truthful, but rather answered a series of questions related to the facts he elicited in his interview and the papers she handed him. He relayed that K. told him the written statement reflected what had happened. This was not necessarily his opinion. The fact that Hasemeyer also stated the paper was consistent with the interview did not make either truthful. Defendant argues that the "clear import of Hasemeyer's testimony and the only reasonable inference from the testimony was that he believed [K.] was telling him the truth because her written statement was consistent with her oral ones to him and she said the written one was 'what had happened,' i.e., the truth." Whether the jury could or would infer that the officer believed K. does not mean that he rendered an opinion on her veracity. As *People v. Melton, supra,* 44 Cal.3d at p. 744 explained in setting forth the principle on which defendant relies, such inferences are the role of "the factfinder, not the witnesses, [who] must draw the ultimate inferences from the evidence." Therefore, such inferences are permissible

*People v. Sergill, supra,* 138 Cal.App.3d 34, illustrates the distinction between Hasemeyer's testimony and an opinion regarding veracity. In that case, two officers were asked to opine as to whether the child victim was telling the truth. (*Id*. at p. 38.) Both officers opined the victim was being truthful and described the basis for their opinions. (*Ibid*.) The first officer explained that when he speaks with child witnesses outside of their parents' presence he " 'can usually determine with a high degree of accuracy whether their statements are true.' " (*Ibid*.) The second officer relied in part on his belief that " '[y]oung children don't know that much about sexual activity.' " (*Ibid*.) Officer Hasemeyer offered no such opinion about K.'s veracity or generalizations about when a witness is telling the truth. Thus, we reject defendant's claim that the court erred in admitting Officer Hasemeyer's testimony, and his corresponding claim that his counsel rendered ineffective assistance by failing to object.

21

*E.     Jury Instructions*

Defendant argues the jury was improperly instructed regarding the burden of proof because CALCRIM No. 1191 told the jury it could infer defendant's guilt of the charged offenses if it found he was predisposed to commit such crimes based on evidence of another sexual offense that was proved only by a preponderance of the evidence. As defendant acknowledges, our Supreme Court rejected this argument in the context of the 1999 revision to CALJIC No. 2.50.01 in *People v. Reliford* (2003) 29 Cal.4th 1007, 1013-1016 (*Reliford*). And as we have previously held, "The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to CALCRIM No. 1191 (which was given here) in its explanation of the law on permissive inferences and the burden of proof. We are in no position to reconsider the Supreme Court's holding in *Reliford* [citation], and by analogy to *Reliford,* we reject defendant's argument regarding the jury instruction on use of his prior sex offense[]." (*People v. Schnabel* (2007) 150 Cal.App.4th 83, 87, fn. omitted.) The same rationale applies to the case before us. We also disagree with defendant's contention that CALCRIM No. 1191 was confusing, internally inconsistent and contradicted other instructions. (See *Reliford, supra,* at p. 1016 ["We likewise reject the Court of Appeal's assertion that the instruction, even if correct, is too 'complicated' for jurors to apply"].) The jury was correctly instructed that if it found defendant committed the uncharged offense by the preponderance of the evidence, it could conclude he was "likely" to commit the charged offenses but "[t]he People must still prove each charge beyond a reasonable doubt." "[W]e will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Ibid*.) There was no instructional error.

*F.     No-Contact Order*

*1. Trial Court's Ruling*

Before trial, the court issued a criminal protective order prohibiting defendant from having contact with K.  At sentencing, the prosecution asked the court to modify the order to prohibit contact for 10 years pursuant to section 136.2, subdivision (i):  "And that's to allow the victim to be free from any further contact by her father given the nature of these offenses."  The prosecution clarified that K. had asked for the 10-year order and "for now she wishes to have no contact whatsoever" with defendant.

Defense counsel argued, "My client has not had any contact with either one of his daughters for over three years.  So it's not a matter of safety for them.  They don't want to see him, and, unfortunately, given the testimony and the accusations and so forth concerning [K.] right now he doesn't want to see her. . . . [¶]  My client probably wouldn't oppose the ten years.  I'm just requesting as an attorney and as a father, et cetera, that there's no reason to impose a ten-year ban.  He hasn't tried to have contact with her.  My request would be made for no more than three years."  The trial court granted the prosecution's request for a 10-year no-contact order.  It noted the order could be modified if defendant and K. reconciled, but "unless and until that happens the criminal protective order will be in full force and effect."

*2. Good Cause*

Defendant claims there was no good cause to support the imposition of a 10-year no-contact order.  To the extent this claim was forfeited by failure to object in the trial court, he contends he was deprived of effective assistance of counsel.  We question whether defendant can assert ineffective assistance of counsel where the record suggests he himself had no objection to the order.  Nonetheless, defendant's claim also fails on the merits.

Penal Code section 136.2, subdivision (i)(1) provides, "In all cases in which a criminal defendant has been convicted of . . . any crime that requires the defendant to

23

register pursuant to subdivision (c) of [Penal Code] Section 290, the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with the victim. The order may be valid for up to 10 years, as determined by the court. . . . It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family." Defendant does not dispute that his conviction requires him to register as a sex offender pursuant to Penal Code section 290, subdivision (c). Therefore, the no-contact order was authorized by statute. Further, the victim of defendant's crime was his daughter, and following these events she went to live with an aunt who has seen it fit to withhold their address even from other family members. Under these circumstances, we will not disturb the trial court's finding of good cause.

## III. DISPOSITION

The judgment is affirmed.

/S/
_____
RENNER, J.

We concur:

/S/
_____
ROBIE, Acting P. J.

/S/
_____
DUARTE, J.

24